COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present: Judges Frank, Kelsey and Alston
Argued at Chesapeake, Virginia


LAROD NAYQUAN ROBINSON

OPINION BY
v.      Record No. 0207-13-1                    JUDGE ROSSIE D. ALSTON, JR.
                                                APRIL 29, 2014

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Christopher W. Hutton, Judge

Christina E. James for appellant.

Kathleen B. Martin, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II,[1] Attorney General, on brief), for appellee.


Larod Nayquan Robinson (appellant) appeals his convictions of robbery, two counts of

use of a firearm, possession of a firearm as a juvenile, and aggravated maiming. On appeal,

appellant alleges that the trial court (i) "erred in denying appellant's motion to suppress despite

Detective Rodey's refusal of appellant's multiple requests to speak to his mother during his

custodial interrogation, rendering the subsequent statements involuntary," and (ii) "erred in

denying appellant's motion to suppress despite Detective Rodey's misrepresentation to appellant

of his legal status as a juvenile and the consequences of failing to make a statement to the police

in violation of his Fifth Amendment rights." Finding no error, we affirm.

I. Background

On November 6, 2010, appellant, fifteen years old at the time, and two friends

approached Nathaniel Gleaton outside a Miller Mart in Hampton, Virginia. During the

---

[1] Mark R. Herring succeeded Kenneth T. Cuccinelli, II, as Attorney General on January
11, 2014.

encounter, appellant pointed a silver handgun at Gleaton and demanded he hand over a distinctive gold necklace he was wearing. Appellant and Gleaton struggled, and appellant fired two gunshots, one of which hit Gleaton in his abdomen and the other in his chest. Gleaton fell to the ground, and his necklace was taken. At that time, a witness driving by saw appellant running from the Miller Mart while putting a gun in his pocket. A black knit hoody sweatshirt was found at the scene and tested for DNA, which later came back as a match for appellant.

At some point after the attack, appellant let Ronald Lee wear Gleaton's necklace. Lee took pictures of himself wearing the necklace, which Diamond Johnson later posted on Facebook. Detective Steven Rodey of the Hampton Police Department became aware of the Facebook postings and questioned Ms. Johnson, who identified Lee as the person in the photographs wearing Gleaton's necklace. Detective Rodey obtained a search warrant for Lee's home, where he found a silver handgun. Forensic ballistics testing determined that the silver handgun found at Lee's home was the gun used to shoot Gleaton. Lee informed Detective Rodey that appellant gave him the handgun to hold at his house and Lee left it there when they went to a game.

In late May/early June of 2011, Detective Rodey, armed with warrants for appellant's arrest, picked up appellant at Newport News Detention Center[2] and transported him to the Hampton Police Department for questioning regarding Gleaton's shooting. Appellant was placed in an interview room, given a drink, and left alone for approximately six minutes before

---

[2] Appellant was in the Newport News Detention Center awaiting sentencing on convictions for armed robbery and malicious wounding. Somewhat significant for the analysis herein is that the events giving rise to appellant's convictions in these matters occurred chronologically after Gleaton's shooting at the Miller Mart. However, appellant was arrested, certified as an adult, and found guilty of these offenses prior to being identified and brought in for questioning regarding his involvement in Gleaton's shooting. For purposes of this opinion, we will refer to those offenses to which appellant had already pled guilty as appellant's "prior convictions" or the "prior charges."

Detective Rodey commenced the interview.[3] Detective Rodey conducted the interview, sitting across from appellant, and Detective Gainer was also present for much of it. At the beginning of the interview, Detective Rodey presented appellant with a <u>Miranda</u> waiver form and read his rights out loud to appellant. Appellant initialed the form on each line and signed the waiver. Detective Rodey advised appellant that he wanted to talk to him about an incident that occurred outside a Miller Mart in November 2010. Initially, appellant denied any involvement.

Approximately sixteen minutes into questioning, appellant asked for his mother. In response to appellant's first request, Detective Rodey told him he could call his mother when he went over to "lock up" and that, due to his certification as an adult in his prior convictions, appellant was "a man" and therefore considered an adult. Appellant proceeded to ask for his mother five more times over the course of the next ten minutes. Detective Rodey responded that appellant could talk to his mother but would have to speak to him (Detective Rodey) first. Detective Rodey also told appellant that his mother would be defensive and probably tell appellant not to say anything to the officers and that would hurt appellant. Appellant began crying after his fifth request for his mother and subsequently confessed to his involvement in robbing and shooting Gleaton outside the Miller Mart. The entire interview lasted approximately five and a half hours total, however the relevant portion leading up to appellant's confession lasted approximately twenty-five minutes. Appellant was later indicted on one count of robbery, two counts of using a firearm while committing a felony, one count of possession of a firearm while under 18 years of age, and one count of aggravated malicious wounding.

Prior to trial appellant moved to suppress his confession, asserting that Detective Rodey's refusal to allow appellant to speak to his mother when the request was made and the misrepresentation of appellant's status as an adult violated appellant's Fifth Amendment rights.

_____

[3] The interview was videotaped, and a DVD of the interview was admitted into evidence at trial.

At the hearing on appellant's motion to suppress, Timothy Prioleau, appellant's parole officer at the time he was committed by the Hampton Circuit Court in May 2011 as a result of his prior convictions, testified. Prioleau testified that appellant was identified as emotionally disturbed by Newport News Public Schools in November 2009. Prioleau also testified that appellant attended Newport Academy, New Horizons Regional Educational Center, for the 2010-2011 school year as a ninth grade student. According to Prioleau, appellant was absent from school twenty-nine days the first semester. That same semester, appellant earned four C's, three D's, and one A. Appellant's mother, Phyllis Shanay Wesley, also testified and stated that appellant had been in an alternative school since third grade. Ms. Wesley testified that appellant read at a seventh grade level and that her second grade daughter was a better writer than appellant.

The trial court denied appellant's motion to suppress, finding appellant's confession was voluntary. As a result, appellant entered conditional pleas of guilty pursuant to Code § 19.2-254 on the four felony counts against him and entered an Alford plea[4] on the misdemeanor count of possession of a firearm while under 18 years of age. The trial court subsequently sentenced appellant to forty years' incarceration with thirty years suspended on the robbery conviction, three years' incarceration on the first conviction for use of a firearm, five years' incarceration on the second conviction for use of a firearm, twelve months' incarceration on the conviction for possession of a firearm as a juvenile, and forty years' incarceration with thirty years suspended on the aggravated malicious wounding conviction. This appeal followed.

---

[4]North Carolina v. Alford, 400 U.S. 25 (1970).

On appeal, appellant asserts that the trial court erred in denying his motion to suppress because Detective Rodey's refusal to honor appellant's requests to see his mother rendered his subsequent confession involuntary.  Appellant also argues that Detective Rodey's representation of appellant's status as an adult, based on his certification as an adult for the prior charges, was incorrect and therefore misled appellant and violated his Fifth Amendment rights.

"On appeal, we review the evidence in the light most favorable to the Commonwealth as the party that prevailed below, and grant to its evidence 'all reasonable inferences deducible therefrom.'"  Cary v. Commonwealth, 40 Va. App. 480, 486, 579 S.E.2d 691, 694 (2003). "[W]e review the trial court's findings of historical fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case."  Id. "'Whether a statement is voluntary is ultimately a legal rather than a factual question, but subsidiary factual decisions are entitled to a presumption of correctness.'"  Rodriguez v. Commonwealth, 40 Va. App. 144, 156, 578 S.E.2d 78, 83 (2003) (quoting Commonwealth v. Peterson, 15 Va. App. 486, 487, 424 S.E.2d 722, 723 (1992)).  "Thus, '[this Court is] bound by the trial court's subsidiary factual findings unless those findings are plainly wrong.'"  Id. (quoting Wilson v. Commonwealth, 13 Va. App. 549, 551, 413 S.E.2d 655, 656 (1992)).

"In assessing voluntariness, the [C]ourt must determine 'whether the statement is the product of an essentially free and unconstrained choice by its maker, or . . . whether the maker's will has been overborne and his capacity for self-determination critically impaired.'"  Roberts v. Commonwealth, 18 Va. App. 554, 557, 445 S.E.2d 709, 711 (1994) (quoting Stockton v. Commonwealth, 227 Va. 124, 140, 314 S.E.2d 371, 381, cert. denied, 469 U.S. 873 (1984)). "Just as in assessing whether the waiver of one's Miranda rights was knowing and intelligent, a

---

[5] Because both of appellant's assignments of error address the voluntariness of his confession, we will discuss both assignments of error together.

court determining whether a confession was voluntary must consider both 'the details of the interrogation' and 'the characteristics of the accused.'" Rodriguez, 40 Va. App. at 157, 578 S.E.2d at 84 (quoting Kauffman v. Commonwealth, 8 Va. App. 400, 405, 382 S.E.2d 279, 281 (1989)). "Such factors include 'the purpose and flagrancy of any police misconduct,' 'the length of the interview,' and any 'moral or psychological pressures to confess from official sources.'" Id. (quoting Morris v. Commonwealth, 17 Va. App. 575, 579, 439 S.E.2d 867, 870 (1994)). "As with the assessment of the voluntariness of a waiver of Miranda rights, 'coercive police activity is a necessary predicate to finding that a confession is not "voluntary" . . . .'" Id. at 157-58, 578 S.E.2d at 84 (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

"'Inasmuch as the degree of pressure necessary to crush one's will varies with the individual and the circumstances of the arrest and detention, a finding of coercion and involuntariness must be based upon a careful consideration of the totality of the circumstances.'" Hill v. Commonwealth, 52 Va. App. 313, 319, 663 S.E.2d 133, 136 (2008) (quoting Ferguson v. Boyd, 566 F.2d 873, 877 (4th Cir. 1977)).

> "The totality [of the circumstances] approach permits - - indeed, it mandates - - inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."

Grogg v. Commonwealth, 6 Va. App. 598, 612, 371 S.E.2d 549, 556 (1988) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). A confession may be involuntary when induced by a "'threat or promise of illegitimate action.'" Hill, 52 Va. App. at 322, 663 S.E.2d at 137 (quoting United States v. Contreras-Del Toro, 892 F. Supp. 159, 160 (N.D. Tex. 1995)). However, "[v]oluntariness is not equated with the absolute absence of intimidation." Id. at 319, 663 S.E.2d at 136 (citing United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir. 1987)). Indeed, while "[a]

- 6 -

deliberate falsehood by a police officer in the course of his duties" is not condoned, it will not render a confession involuntary unless it "impede[s the defendant's] . . . 'ability to understand the nature of his rights and the consequences of abandoning them.'" Wilson, 13 Va. App. at 554, 413 S.E.2d at 658 (quoting Foster v. Commonwealth, 8 Va. App. 167, 174-75, 380 S.E.2d 12, 16 (1989)).

Federal and state courts have long-recognized the importance of taking particular care when assessing whether a juvenile's admissions are voluntary.

> If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense that not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.

In re Gault, 387 U.S. 1, 55 (1967). The presence of a parent, however, is not dispositive of whether a juvenile's confession was made voluntarily. Rather, the absence of a parent is "'a circumstance that weigh[s] against the admissibility of the confession.'" Grogg, 6 Va. App. at 613, 371 S.E.2d at 557 (quoting Miller v. Maryland, 577 F.2d 1158, 1159 (4th Cir. 1978)).

In Potts v. Commonwealth, 35 Va. App. 485, 546 S.E.2d 229 (2001), we considered a similar factual scenario to that presented in this case. In Potts, the seventeen-year-old suspect, Kevin Potts, was arrested outside of his mother's house and taken to a police station for questioning. Id. at 489, 546 S.E.2d at 231. Detective Mollen placed Potts in an interview room, removed his handcuffs, and offered him a drink and an opportunity to use the restroom. Id. Detective Mollen read Potts his Miranda rights at the beginning of the interview and asked Potts if he understood his rights, to which Potts responded he did. Id. at 490, 546 S.E.2d at 231. Detective Mollen knew that Potts had not been attending school regularly and that he had previously been arrested on other minor charges. Id. While the detective did not know if Potts had experienced police interrogation before, he "likely knew" that Potts's mother made several

- 7 -

demands to officers that her son not be questioned without the presence of an attorney. Id. Approximately one minute into the interview, Potts stated that he wanted to speak to an attorney. Id. Potts also asked if he could speak with his mother, to which Detective Mollen answered "Nope." Id. at 490, 546 S.E.2d at 232. Potts responded "Nope? What's up with the lawyer then?" Id. Detective Mollen stated that Potts "would get [a lawyer] when [he] got one." Id. Potts then asked, "What's that mean?" Id. at 491, 546 S.E.2d at 232. Detective Mollen said he could not put him on the phone with a lawyer at that moment, but that Potts was "arrested, and [he would] be charged and we'll just go from there." Id. Potts then stated he did not want a lawyer, asked Detective Mollen what he wanted to know, and subsequently confessed. Id.

This Court affirmed the trial court's denial of appellant's motion to suppress his confession, holding it was voluntary. Id. at 497, 546 S.E.2d at 235. The Court noted that Potts, though a high-school dropout, was intelligent and articulate, seemed fine and sober; was responsive to questions; did not have trouble focusing, and remained calm, despite crying at times. Id. at 496, 546 S.E.2d at 234. Furthermore, the Court found no evidence of coercion as Potts was questioned in a room big enough for him to move around in by one plainclothes detective, he wore no restraints, and Detective Mollen never threatened him or told him to keep talking after Potts requested an attorney. Id. at 496-97, 546 S.E.2d at 235. As coercion is a "necessary predicate for a finding that a confession is involuntary," Potts's confession was voluntary. Id. at 497, 546 S.E.2d at 235.

In this case, many of the circumstances surrounding Potts's confession were the same for appellant.[6] Appellant was placed in a room without restraints, given a drink, and an opportunity to use the restroom. He gave no indication of being under the influence of drugs, responded to questions asked, and remained calm, despite crying towards the end of the interview when he

---

[6] Notably, however, unlike Potts, appellant never asked for counsel.

confessed. The portion of the interview leading up to appellant's confession lasted less than half an hour. Additionally, Detective Rodey read appellant his <u>Miranda</u> rights aloud at the beginning of the interview and appellant signed the waiver form. Throughout the videotaped interview,[7] Detective Rodey sat across a table from appellant and his demeanor, tone, and language while questioning appellant were neither aggressive nor threatening. While it is clear from Prioleau's and appellant's mother's testimony that appellant had some emotional and learning disabilities, those issues did not prevent appellant from progressing through school and earning passing grades. While his attendance and academic records are not ideal, neither are they so lacking that we can say appellant's ability to understand the extent and nature of his rights was so impaired as to render his confession involuntary.

Furthermore, while Detective Rodey's statements to appellant that he was considered an adult for purposes of the new charges were inaccurate,[8] appellant never argued that the

---

[7] Because the interview was videotaped and made part of the record, the Court took the opportunity to view the relevant portion.

[8] It appears from the record that based on the fact that appellant had previously been certified as an adult with respect to the prior convictions for which he was being held at the Newport News Detention Center, Detective Rodey believed appellant would be charged as an adult. Detective Rodey had conferred with the Commonwealth's Attorney and obtained warrants for appellant's arrest for his involvement in Gleaton's shooting. Detective Rodey was advised sometime after appellant's confession that due to the fact that appellant had already been found guilty on the prior charges, appellant would have to be held in custody on petitions through the juvenile and domestic relations district court for the new charges arising from Gleaton's shooting.

We note that Code § 16.1-271 does not apply in this case. Code § 16.1-271 provides in relevant part that:

> Any juvenile who is tried and convicted in a circuit court as an adult under the provisions of this article shall be considered and treated as an adult in any criminal proceeding *resulting from any alleged future criminal acts and any pending allegations of delinquency* which have not been disposed of by the juvenile court at the time of the criminal conviction.

(Emphasis added.)

misrepresentation was intentional or made in bad faith.  More importantly, the misrepresentation does not rise to the level of such deliberate deception or coercion as would compel appellant to involuntarily confess.  Indeed, Detective Rodey's statement did not "impede [appellant's] . . . 'ability to understand the nature of his rights and the consequences of abandoning them.'" Wilson, 13 Va. App. at 554, 413 S.E.2d at 658 (quoting Foster, 8 Va. App. at 174-75, 380 S.E.2d at 16).  Appellant had been made aware of and acknowledged his Miranda rights and, moreover, it was not his first experience with the justice system.

For these same reasons, we cannot say that Detective Rodey's refusal of appellant's requests to see his mother rendered appellant's confession involuntary or coerced.  At its core, this case assesses the significance of a juvenile's request for a parent in the context of determining the *voluntariness* of a subsequent confession, an issue that has not been specifically addressed by the Supreme Court or this Court.  Indeed, while this case may highlight significant concerns previously raised in the jurisprudence relating to law enforcement personnel declining to honor a minor's request to see his parent when subjected to custodial interrogation, given the specific facts of this case, we cannot say that appellant's confession was coerced.  Appellant was not unfamiliar with the justice system.  He had recently pled guilty to and was awaiting sentencing on very similar charges of armed robbery and malicious wounding.  Detective Rodey did not do anything to overbear appellant's will or physically intimidate appellant to obtain the confession.  To the contrary, Detective Rodey stated that appellant could talk to his mother later. Finally, before ever asking for his mother and less than thirty minutes before his confession,

---

Because the events giving rise to appellant's prior convictions occurred chronologically after Gleaton's shooting at the Miller Mart, Gleaton's shooting was not an "alleged future criminal act."  Furthermore, charges against appellant for Gleaton's shooting were not pending at the time of appellant's prior convictions.  Therefore, Detective Rodey's statement to appellant that he was considered an adult, while made in good faith, was in fact inaccurate.

appellant had been informed of his <u>Miranda</u> rights, acknowledged his understanding of them, signed a waiver to that effect, and never requested counsel.[9]

For these reasons, we hold that appellant's confession was voluntary and that the trial court did not err in refusing to suppress it.

<u>Affirmed.</u>

---

[9] To this end we necessarily conclude that an effective invocation of the right to counsel does not stand on an equal analytical framework to a request for a parent.